UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-80880-CIV-RYSKAMP/VITUNAC

QSGI, INC.,

    Plaintiff,

v.

IBM GLOBAL FINANCING, a division of
International Business Machines Corporation,
INTERNATIONAL BUSINESS MACHINES
CORPORATION, parent to and/or d/b/a
IBM GLOBAL FINANCING,

    Defendant.
_____/

## ORDER GRANTING MOTION TO DISMISS

THIS CAUSE comes before the Court pursuant to Defendants International Business Machines Corporation ("IBM") and IBM Global Financing ("IGF")'s (collectively, "Defendants") motion to dismiss the second amended complaint, filed September 26, 2011 **[DE 19]**.  Plaintiff QSGI, Inc. ("QSGI," or "Plaintiff") responded on October 28, 2011 **[DE 24]**.  Defendants replied on November 7, 2011 **[DE 28]**.  This motion is ripe for adjudication.

### I.    BACKGROUND

QSGI alleges that it built a business based on its particular practice of "purchas[ing] used IBM mainframe computers on the open market," changing their processing capacity, or reconfiguring them, and reselling them to end-user customers. (Compl. ¶¶ 11, 13.)  Specifically, QSGI claims that its ability to downgrade the processing capacity of used IBM mainframes was critical to its success and that it needed IBM microcode and parts to do so.  (*Id.* ¶ 13.)  The

Complaint does not identify any other third party that engaged in this particular business practice.

According to the Complaint, in or around 2007 IBM adopted a policy that it would only sell the parts and microcode needed to reconfigure a used IBM mainframe computer if it had been installed and in use by the customer for at least six months (the "six-month rule"). (*Id.* ¶¶ 13, 16.) Moreover, QSGI alleges that, while IBM enforced the six-month rule against QSGI, it did not enforce the rule against IGF, permitting IGF to change the capacity of used IBM mainframes prior to shipping. (*Id.* ¶¶ 16, 18.)[1] Because QSGI's business model allegedly centered on selling changed-capacity mainframes, QSGI asserts that IBM's policy disadvantaged it relative to IGF, forcing QSGI out of business. (*Id.* ¶¶ 13, 16-18.)

QSGI frames its Complaint as one of monopolization, alleging that IBM used its "monopoly power to quash QSGI's ability to compete and exist in the marketplace for used IBM mainframe computers." (*Id.* ¶ 18.) For its causes of action, QSGI first asserts a violation of the Florida Antitrust Act and, second, repackages the same claim as a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). (*See id.* ¶ 1.) Defendants move for the dismissal of both claims.

## II. LEGAL STANDARD

On a motion to dismiss, while the Court takes the plaintiff's allegations as true, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (citing *South Florida Water Mgm't Dist. v. Montalvo*, 84 F.3d 402, 406 (11th Cir. 1996)).

---

[1] IGF is not a legal entity, but rather an IBM business unit that in the United States is a business segment of IBM Credit LLC, a wholly owned subsidiary of IBM.

Plaintiff's obligation to provide the grounds for his entitlement to relief requires more than "labels and conclusions," and a "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007)). "The point is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 974 (11th Cir. 2008) (quoting *Twombly*, 127 S.Ct. 1955, 1964 (2007) and finding allegations insufficient to meet *Twombly* standard). A complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S.Ct. at 1965. "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft*, 129 S.Ct. at 1950. A determination of whether a complaint states a plausible claim for relief requires the reviewing court "to draw on its judicial experience and common sense." *Id.* When a plaintiff fails to plead factual content permitting the court to infer more than the mere possibility of misconduct, it has not "shown" entitlement to relief. *Id.* (quoting Fed.R.Civ.P. 8(a)(2)).

### III.     DISCUSSION

A.     **Failure to Plead Antitrust Injury**

Antitrust standing requires a specific showing of antitrust injury, that is, that there is a public harm from the alleged conduct that coincides with a plaintiff's private harm. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449-50 (11th Cir. 1991). As the Eleventh Circuit has stated, "antitrust injury [i]s the touchstone for antitrust standing." *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389 (11th Cir. 1990); *see also NicSand, Inc. v. 3M Co.*, 507 F.3d

442, 450 (6th Cir. 2007) (antitrust injury is a "'necessary , but not always sufficient' condition of antitrust standing" (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)). As such, where a plaintiff's antitrust claim merely alleges harm to an individual competitor, dismissal is warranted.  *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Comms., Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) ("Critically, under both sections [One and Two of the Sherman Act], an antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor."); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F.Supp.2d 1260, 1276 (S.D. Fla. 2009) (finding no standing to bring Sherman Act or Florida Antitrust Act claims where "[t]he Amended Complaint alleges many detriments to Plaintiff, but it does not allege 'antitrust injury'").  Federal antitrust standing law applies to Florida Antitrust Act claims. *See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.").

Absent factual allegations of antitrust injury, an antitrust claim will fail under *Twombly* and *Iqbal*. *Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555.  Without such allegations, there can be no plausible claim to relief on an antitrust claim that could withstand dismissal.  *See, e.g.*, *NicSand*, 507 F.3d at 451 ("a 'naked assertion' of antitrust injury, the Supreme Court has made clear, is not enough; an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury" (quoting *Twombly*, 550 U.S. at 557)).

Properly pleading antitrust injury requires allegations, rooted in fact, of the anticompetitive effects of the conduct alleged to violate the antitrust laws.  *Todorov*, 921 F.2d at 1450 ("[Plaintiffs] must plead and prove that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent.").  QSGI

makes no allegations as to the structure of the alleged market for used IBM mainframe computers. While QSGI alleges that IBM has a 35% market share of a purported "new mainframe computer market" (Compl. ¶ 7), it fails to allege IBM's market share in the purported used IBM mainframe computer market. QSGI also fails to allege what its own market share was before and after IBM's purported adoption of the six-month rule in 2007; how many competitors are in the purported used IBM mainframe market; the strength of any other competitor in the purported market; how other competitors were impacted, if at all; or why QSGI's exit from that market would result in uncompetitive prices to customers. QSGI has not identified a single competitor (other than itself) that supposedly has been harmed by IBM's six-month rule; nor has QSGI identified a single customer adversely affected by the rule. QSGI has not explained how competition in the alleged market has been reduced by IBM's rule, or how customers could have been adversely affected. On the contrary, QSGI alleges that its business model involved purchasing used IBM mainframe computers on the "open"—*i.e.*, freely competitive—market. (Compl. ¶ 11.) QSGI gives no reason to think that this "open market" does not still exist.

In *Spanish Broadcasting*, Spanish Broadcasting System ("SBS") brought antitrust claims under the Sherman Act against Clear Channel Broadcasting ("CC") and Hispanic Broadcasting Channel ("HBC") alleging that CC and HBC had conspired to harm SBS, induced its employees to breach their employment contracts, hindered its ability to raise capital, and discouraged advertisers from purchasing ad time on SBS. 376 F.3d at 1069-70. SBS's allegations of harm included "weakened stock prices, restricted access to capital markets, loss of employees, damaged reputation, and loss of advertising revenue." *Id.* at 1072. The district court dismissed SBS's complaint, and the Eleventh Circuit affirmed, holding that SBS's complaint failed to

allege harm to competition.  *Id.* at 1072-74, 1076-77.  The Court of Appeals noted that the complaint contained "no allegations at all about a factual connection between the conduct alleged and overall impact on the advertising market." *Id*. at 1072.  The court rejected SBS's argument that as the primary competitor in its alleged market, any damage to SBS inherently damaged competition, explaining that SBS had failed to meet its burden of supporting this inference with "specific factual allegations" such as "specific damage done to consumers in the relevant market." *Id.* at 1072-73.

Here, all the allegations concern the unique impact of IBM's six-month rule on QSGI's chosen business strategy.  QSGI offers a few wholly conclusory allegations to the effect that IBM used its purported market power to "injure[] competition", "restrict competition" and "render[] it impossible for competition to exist." (Compl. ¶¶ 22, 23.)  Such naked assertions of harm to competition cannot withstand dismissal under the *Twombly* and *Iqbal* pleading standard.  *See CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 571-72 (6th Cir. 2009) (allegations of "restricting competition", "decreasing options" and "increasing . . . costs" insufficient to establish antitrust standing).  Accordingly, QSGI's antitrust claim is dismissed.  *See George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 140 (2d Cir. 1998) (affirming dismissal for lack of antitrust standing where "Plaintiff has failed to plead its own market share" or the "market share purportedly absorbed by" the defendant's alleged co-conspirator); *Glades Pharms., LLC v. Murphy*, No. 1:06-CV-0940, 2006 WL 3694625, at *3 (N.D. Ga. Dec. 12, 2006) (dismissing complaint, noting that "[t]he complaint makes no mention of how many competitors are in the [relevant] market or why [defendant's] entrance into the market would 'reduce prices'").

QSGI's reliance on *Global Candle Gallery Licensing Co. v. Nabozny*, No. 8:08-CV-2532,

2009 WL 3852794 (M.D. Fla. Nov. 18, 2009), is unavailing.  The *Global Candle* antitrust plaintiff, unlike QSGI, identified a relevant market and made specific allegations of antitrust injury.  *See id.* at *3.

The Court disregards QSGI's conclusory allegations about purportedly uncompetitive prices because they are contradicted by other specific factual allegations in the complaint.  *See United States ex rel. Carroll v. JFK Med. Ctr.*, No. 01-8158-CIV, 2002 WL 31941007, at *2 (S.D. Fla. Nov. 15, 2002) (court not required to credit "internally inconsistent" allegations).  For example, QSGI claims to have purchased used IBM mainframe computers on the "open market." (Compl. ¶ 11.)  If used IBM mainframe computers are available for purchase on the "open market," then QSGI is not the only entity that can purchase them.  There is nothing in the complaint to suggest that customers cannot buy them, too, or that the elimination of QSGI's middleman services actually reduced the supply of used IBM mainframe computers.  QSGI's allegation that IBM has a 35% market share necessarily leaves 65% of the market to competitors.  This allegation is also inconsistent with QSGI's antitrust claim.  QSGI's Florida Antitrust Act claim is dismissed.

**B.**     **Failure to State a FDUPTA Claim**

A claim under FDUPTA has three elements: "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages."  *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286, 1292 (M.D. Fla. 2009).  A FDUTPA claim may be alleged as a "*per se* violation premised on the violation of another law proscribing unfair or deceptive practice."  *Hap v. Toll Jupiter Ltd. P'ship*, No. 07-81027-CIV-RYSKAMP, 2009 WL 187938, at *9 (S.D. Fla. Jan. 28, 2009).

QSGI makes no allegations that IBM's purported adoption in 2007 of the six-month rule is in any way deceptive. QSGI also fails to allege any facts suggesting that IBM's conduct was at all unfair other than a conclusory assertion that use of "monopoly power" is an "unfair business practice." (Compl. ¶ 25.) QSGI's FDUTPA allegations are, thus, merely a repackaging of the allegations offered for its antitrust claims. When, as here, a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim. *See JES Props., Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *19 & n.23 (M.D. Fla. May 9, 2005) ("Plaintiffs concede that their FDUPTA claims 'survive' or 'fall' with their antitrust claims."); *see also Hunter v. Bev Smith Ford, LLC*, No. 07-80665-CIV-RYSKAMP, 2008 WL 1925265, at *9 (S.D. Fla. Apr. 29, 2008) (plaintiffs based all FDUTPA allegations on violations of state and federal statutes that the court had already considered and rejected, thus there could be no FDUTPA violation). Because QSGI's antitrust claim have been dismissed, QSGI's FDUTPA claim cannot survive.

The FDUPTA claims is also subject to dismissal because QSGI failed to plead "actual damages" as required by Florida law. "[A]ctual damages" under section 501.211(2) is "a term of art." *Eclipse Med., Inc. v. Am. Hydro-Surg. Instruments, Inc.*, 262 F.Supp.2d 1334, 1357 (S.D. Fla. 1999). "The measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered according to the contract of the parties," except that where a product is "rendered valueless" as a result of a defect, "purchase price is the appropriate measure of damages." *Jovine v. Abbott Labs., Inc.*, 795 F.Supp.2d 1331, 1344 (S.D. Fla. 2011) (quoting *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 4th DCA 1984); *see also*

9

*Eclipse Med.*, 262 F.Supp.2d at 1357.

QSGI has failed to plead any facts from which one could plausibly infer the degree to which, or even whether, the market value of any product has changed as a result of IBM's purported conduct. Nor has QSGI pled that any product has been rendered valueless as a result of a defect such that a purchase price (also not alleged) could stand in as the market value for purposes of actual damages.

All that remains is QSGI's repeated claim to consequential damages in the form of "lost profits" and "lost business." (Compl. ¶¶ 17, 18, 26, 31.) But consequential damages are not recoverable under FDUTPA. *Eclipse Med.*, 262 F.Supp.2d at 1357 ("Florida courts specifically reject the recovery of consequential damages under FDUTPA."). Because QSGI failed to plead facts sufficient to show actual damages under FDUTPA, the FDUPTA claim is dismissed..

## IV.    CONCLUSION

THE COURT, having considered the pertinent portions of the record and being otherwise fully advised, hereby

ORDERS AND ADJUDGES that the motion to dismiss, filed September 26, 2011 **[DE 19]**, is GRANTED. The second amended complaint is DISMISSED WITHOUT PREJUDICE. QSGI may have fifteen days from the date of this order to file an amended complaint.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this 13th day of March, 2012.

S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE