UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 11-CV-80880-RYSKAMP

QSGI, INC.,

    Plaintiff,

v.

IBM GLOBAL FINANCING, and
INTERNATIONAL BUSINESS
MACHINES CORPORATION,

    Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

THIS CAUSE comes before the Court pursuant to Defendants International Business Machines Corporation ("IBM") and IBM Global Financing ("IGF")'s (collectively, "Defendants") motion to dismiss the second amended complaint, filed April 16, 2012 **[DE 54]**. Plaintiff QSGI, Inc. ("QSGI," or "Plaintiff") responded on May 11, 2012 **[DE 78]**. Defendants replied on May 21, 2012 **[DE 84]**. This motion is ripe for adjudication.

### I.    Background

QSGI was engaged in the "business of purchasing, selling and servicing used IBM mainframe computers" throughout the United States, and alleges that purchasers of these mainframe computers must "modify the large and complex mainframes to fit their needs so that they do not overpay for the licensing of the operating system." (2d Am. Compl. ¶¶ 3, 9). QSGI's business model was dependent on modifying and selling the used IBM mainframe

computers to fit the computing requirements of the end-user purchaser, such that the purchaser would not have to pay the additional licensing costs that are calculated as a function of the Millions of Instructions Per Second ("MIPS") capacity. (*Id*. ¶¶ 9, 40-42). QSGI alleges that used mainframe computers "are only economically viable to the purchaser provided that they can be modified upon purchase to fit the needs of the new purchaser to avoid overpaying" for the monthly expenses of licensing the operating systems for the "unnecessary MIPS." *Id*. In order to modify and remarket the used mainframe computers, QSGI (and other companies in the product market) require IBM's proprietary micro-code, which QSGI alleges is central to IBM's monopoly power in this market. (*Id*. ¶ 30). QSGI identifies third parties in the used mainframe market that were allegedly adversely affected by the Defendants' activity. (*Id*. ¶ 35).

QSGI alleges that, in or around the summer of 2007, IBM adopted a policy whereby it prohibited the modification of any recently purchased used IBM mainframe computer's MIPS capacity for a period of six months (the "six-month rule"). (2d Am. Compl. ¶ 31). Further, it is alleged that the six-month rule adversely affected QSGI and other companies in the used mainframe computer market. (*Id*. ¶¶ 31-36). QSGI argues that the six-month rule, in effect, did not apply to IGF, as IGF mainframe computers could still be modified by IBM technicians with access to parts and proprietary micro-code prior to shipping the product. (*Id*.) Thus, QSGI asserts that, as a result of the six-month rule, IBM's policy unfairly disadvantaged QSGI and other companies in the used mainframe computer market, because it made their services no longer economically viable, while also effectively granting an exemption to IGF based on their access to proprietary IBM products. (*Id*. ¶¶ 34, 39-42).

QSGI's Second Amended Complaint asserts that IBM's dominance in the new and used IBM mainframe computer product market in the United States, combined with the alleged

anticompetitive behavior, the six-month rule, is indicative of attempted monopolization. QSGI alleges that IBM has "directly injured QSGI and every company that is involved in the purchase, service, and sale of used IBM mainframes." (*Id*. ¶ 34). QSGI asserts a violation of the Florida Antitrust Act of 1980, Fla. Stat. § 542.15, *et seq*., and repackages the same claim as a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat § 501.201, *et seq*. Defendants move for dismissal with prejudice of both claims.

## II.     Legal Standard

To state a claim for relief, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Although the court takes plaintiff's allegations as true, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (citing *South Florida Water Mgm't Dist. v. Montalvo*, 84 F.3d 402, 406 (11th Cir. 1996)). Further, "a court's duty to liberally construe a plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for [him]." *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007)). A claim will be deemed plausible for the purposes of surviving the motion when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although extensive detailed factual allegations are not required, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do . . . ." *Twombly*, 550 U.S. at 555 (alteration in original) (internal quotation marks omitted) (citations omitted).  Moreover, the inclusion of plausible factual allegations must exceed a threshold such that the "allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.*

### III.   Discussion

**A. QSGI's Allegations of Antitrust Injury are Insufficient, and Therefore QSGI Lacks Antitrust Standing.**

When interpreting the Florida Antitrust Act, this Court must rely on the body of federal case law interpreting the Sherman Act and the federal common law requirements for antitrust standing.  *See Vitacost.com, Inc. v. Gaia Herbs, Inc.*, No. 06-81141-CIV, 2007 WL 286262, at *1-2 (S.D. Fla. Jan. 29, 2007); *see also All Care Nursing Serv. v. High Tech Staffing Servs.,* 135 F.3d 740, 746 (11th Cir.1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law."); Fla. Stat. § 542.32 ("It is the intent of the Legislature that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."); *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.,* 457 So.2d 1028, 1032 (Fla. Dist. Ct. App.1984) ("The Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act.").  Thus, analysis of the law under the Sherman Act and federal common law standing doctrine is also applicable to QSGI's state law antitrust claim.

The Eleventh Circuit applies a two-pronged approach in establishing whether a plaintiff has antitrust standing.  *See Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1991).  First, in order to maintain an antitrust action, a plaintiff must prove an "antitrust injury," which is a showing greater than a mere injury linked to a violation of the antitrust laws. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991) (citing *Brunswick*

*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977)). Antitrust injury is defined as:

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause.

*Id.* (internal citations and quotations omitted). The plaintiff must prove that there is a public harm that coincides with the antitrust plaintiff's private harm. *Todorov*, 921 F.2d at 1449-50. Thus, if the injury suffered is "inextricably intertwined with the injury that the conspirators [seek] to inflict" or "flows from that which makes defendants' acts unlawful" in the relevant antitrust market, such injury "falls squarely within the area of congressional concern." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 491, 102 S.Ct. 2540, 2555 (1982); *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697.

The second prong of the antitrust standing inquiry is whether the plaintiff is an efficient enforcer of the antitrust laws. *Mun. Utilities Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1499 (11th Cir. 1991) (citing *Cargill, Inc. v. Monfort*, 479 U.S. 104, 110 n.5, 107 S.Ct. 484, 489 n.5 (1986)). The Eleventh Circuit continues to apply the "target area test." *Monsanto Co.*, 105 F.3d at 1374 (citing *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir.1990)); *but see Todorov*, 921 F.2d at 1450-51, n.19 (noting that "[t]he Supreme Court[1] specifically rejected the 'target area' test that had previously been used in this circuit"). The target area test requires that the plaintiff establish that "he is within that sector of the economy

---

[1] The Supreme Court, in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S. Ct. 897 (1983), and subsequently in *Cargill*, 479 U.S. 104, 107 S.Ct. 484, declined to apply this test, reasoning that it may lead to contradictory and inconsistent results. Instead, the Court identified "other factors in addition to antitrust injury" to determine whether a particular plaintiff was an efficient enforcer of the antitrust laws. *Cargill*, 479 U.S. at 111 n.6, 107 S.Ct. at 490 n.6.

endangered by a breakdown of competitive conditions in a particular industry," and that he is "the target against which anticompetitive activity is directed." *Id*. (quoting *National Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir. 1984), *cert denied sub nom.*, *Patterson v. Buena Vista Distribution Co.*, 474 U.S. 1013, 106 S.Ct. 544 (1985)). That is, the test demands that the antitrust plaintiff is among the competitors in the relevant antitrust market against whom defendant's alleged violation is directed. *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1493 (11th Cir. 1985). Because the instant case turns on a lack of antitrust injury, the second prong of establishing antitrust standing is unnecessary.

Where an antitrust plaintiff merely alleges harm to an individual competitor, not harm to competition generally, antitrust injury has not been established and dismissal is warranted. *See Spanish Broad. Sys. Of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004). Absent factual allegations of antitrust injury, an antitrust claim will fail under the pleading standards prescribed by *Twombly* and *Iqbal*. *See Iqbal*, 556 U.S. at 678-79, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. Without factual allegations, not merely conclusory ones, there cannot be a plausible claim to relief on an antitrust claim that could withstand dismissal. *See, e.g.*, *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) ("[A] 'naked assertion' of antitrust injury, the Supreme Court has made clear, is not enough; an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury." (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. at 1959)).

The alleged antitrust violation at issue here is IBM's monopolization or attempted monopolization of the alleged used IBM mainframe computer market. In order for QSGI to establish a proper claim, QSGI must assert that IBM willfully acquired or maintained market

power in the relevant market.[2]  QSGI must establish sufficient antitrust injury, that is, that the injury flowed from IBM's willful acquisition or maintenance of monopoly power in the relevant market.  Although QSGI has pleaded harm to itself, it has failed to plead harm to competition.  QSGI's wholly conculsory and inconsistent allegations related to competitive harm in the relevant product and geographic market does not raise QSGI's "right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965.

QSGI alleges that the six-month rule has resulted in the bankruptcy of QSGI and harmed other businesses in the used mainframe computer market.  Further, QSGI alleges that "[a]t all times material hereto IBM and IGF had monopoly power . . . demonstrated by its 90% market share" and IBM currently "commands approximately 90 percent of the market."  (2d Am. Compl. ¶¶ 75, 29.)  These allegations suggest that there has not been an increase in Defendants' market share and thus are not indicative of attempted monopolization.  Moreover, QSGI, in a wholly conclusory fashion, alleges that IBM and IGF have "increased their market share of used IBM mainframes to approximately 100%."  (*Id*. at ¶ 83).  There are several issues with this allegation.  First, this allegation is inconsistent with the preceding allegation that IBM had a 90% market share "at all times material hereto."  (*Id*. at ¶ 75).  Second, this also is an inconsistent allegation when considering that other competitors are still operating in the relevant product market.  (*Id*. at ¶ 35).  This Court "need not accept facts that are internally inconsistent, facts that run counter to facts which the court may take judicial notice of, conclusory allegations, unwarranted deductions, or mere legal conclusions." *U.S., ex rel. Carroll v. JFK Med. Ctr.*, No. 01-8158-CIV, 2002 WL 31941007, at *2 (S.D. Fla. Nov. 15, 2002); *Campos v. Immigration and Naturalization Service*, 32 F.Supp.2d 1337, 1343 (S.D.Fla.1998).

---

[2] Although not alleged in QSGI's Second Amended Complaint, this in effect is an alleged 15 U.S.C. § 2 violation.

QSGI has also not sufficiently pleaded cognizable harm to competition based on its allegations pertaining to harm against competitors in the used IBM mainframe computer market. Although QSGI asserts that other competitors in the used IBM mainframe computer market were "adversely effected [sic] by the sixth-month [sic] rule in a manner similar to QSGI," this conclusory allegation is not rooted in fact and is at odds with some of the allegations in QSGI's Second Amended Complaint. (2d Am. Compl. ¶ 35). QSGI lists eight competitors, all of which are still in business,[3] and QSGI does not assert that any of these companies have lost market share as a result of the six-month rule. It is possible that some of the non-IBM competitors absorbed QSGI's market share upon its dissolution, which cannot be considered harm to competition. *See George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 140 (2d Cir. 1998) (affirming dismissal for lack of antitrust standing where "plaintiff has failed to plead its own market share" or the "market share purportedly absorbed by" the defendant's alleged coconspirator). QSGI's pleading largely alleges injury only to itself and does not allege antitrust injury. *Todorov*, 921 F.2d at 1449.

Finally, QSGI has not alleged perceivable harm to customers as a result of IBM's six-month rule with sufficient particularity. Although QSGI alleges that certain customers would have been able to purchase used IBM mainframe computers at a QSGI-quoted price "but for the enactment of the six-month rule," the naked assertions that attempt to buttress the claim are unsupported and conclusory. (2d Am. Compl. ¶¶ 50-60). QSGI solely alleges that the end-user purchaser can no longer purchase used IBM mainframe computers for a "significantly lower amount from QSGI" and must now purchase the products from IBM and IGF at supra-competitive prices. (*Id.* at ¶¶ 59-62). QSGI fails to allege why the customers did not buy these

---

[3] *See* (DE 54, p.13) (listing the eight competitors' websites that are still operating in the used IBM mainframe computer market).

products from QSGI or what the customers ultimately ended up doing. QSGI's allegations are quite vague and unclear as to whether the customers purchased used IBM mainframe computers from IBM, IGF or one of the other used IBM mainframe competitors still in the market, whether they paid a higher price, whether it included related services, maintenance, or software, or whether they elected not to purchase a used IBM mainframe computer from *any* supplier. Moreover, as Defendants correctly assert, even if some customers bought used mainframe computers from IBM or IGF, such does not necessarily indicate that the customers paid supra-competitive prices. Because these products are quite specialized and tailored to the needs of the end-user purchaser, it is expected that they would be priced differently than that quoted by QSGI, and that the expenditure of a larger amount may also include a more powerful computer, or a more extensive maintenance plan. (*Id*. at ¶¶ 9-10).

QSGI fails to allege the necessary harms to competition and actual anticompetitive effects. QSGI's conclusory allegations largely assert its own injury, that is "bankruptcy, damages and resulting lack of competition," and attempt to construct an antitrust claim out of the ruins of its failed business model. (Opp. at ¶ 10). Thus, QSGI's conclusory allegations are "not entitled to be assumed true" under the post-*Twombly* pleading requirements, and QSGI's assertions are insufficient to establish antitrust injury. *See Todorov*, 921 F.2d at 1449; *Spanish Broad. Sys. Of Fla., Inc.*, 376 F.3d 1065, 1069. Because QSGI has failed to plead changes in IBM's market share with particularity, and has made insufficient allegations of harm to both competition and consumers, QSGI's antitrust claim is dismissed with prejudice.[4] *See, e.g.*, *Mantz v. TRS Recovery Servs.*, No. 11-80580-CIV, 2011 WL 5515303 (S.D. Fla. Nov. 8, 2011)

---

[4] Although QSGI alleges antitrust injury based on IBM's six-month rule beginning in 2007, QSGI made no effort to preserve relevant documents in anticipation of a potential lawsuit. QSGI has admitted to the destruction of documents in a storage facility in Minnesota in 2009, and now QSGI has essentially no documentation or information to establish a basis for a proper antitrust claim. *See* (Plaintiff's Response to IBM's Motion to Compel Compliance with March 16, 2012 Order and For Sanctions for Noncompliance (May 7, 2012, ECF No. 70)).

(dismissing complaint with prejudice after single opportunity to amend where permitting an additional opportunity to amend would be futile).

### B.  QSGI Fails to State a valid FDUTPA Claim.

FDUTPA provides that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Fla. Stat. § 501.204.  In order to state a claim under the FDUTPA, plaintiff must establish three elements "(1) a deceptive or unfair practice, (2) causation, and (3) actual damages." *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286, 1292 (M.D. Fla. 2009).  Deception occurs "if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment," which requires "a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer."  *Silver v. Countrywide Home Loans, Inc.*, No. 11-12282, 2012 WL 2052949 (11th Cir. June 8, 2012) (quoting *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir.2007)).  When a plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of the antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim.  See *JES Props. Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005).

QSGI's FDUTPA allegations are a repackaging of its monopolization claims, based on its assertion that by "enact[ing] the six-month rule" IBM "engaged in an unfair and deceptive act." (2d Am. Compl. ¶ 65).  This allegation is embedded within QSGI's primary antitrust claim, in the assertion that IBM used its "monopoly power to enact the six-month rule."  (*Id.*)  In QSGI's Response to IBM's Motion to Dismiss, QSGI asserts that the FDUTPA claim is "dependent upon a finding that [Defendants] unfairly monopolized the market for used IBM mainframes." (DE 78,

¶11).  Since this Court has found no violation of the Florida Antitrust Act, and QSGI's FDUTPA claim is based on the same allegations as the antitrust claim, this Court finds that QSGI has also failed to state a FDUTPA claim.

QSGI's FDUTPA claim also fails because QSGI fails to plead actual damages.  Actual damages are measured by "the difference in the market value of the product or service in the condition in which it was delivered according to the contract of the parties," except where the product is rendered valueless due to defect, whereby the purchase price becomes "the appropriate measure of damages."  *Jovine v. Abbott Laboratories, Inc.*, 795 F.Supp.2d 1331, 1344 (S.D. Fla. 2011) (quoting *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. Dist. Ct. App. 1984)).  Under FDUTPA, actual damages do not include consequential damages.  *See Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F.Supp.2d 1334, 1357 (S.D. Fla. 1999) (citing *Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987)).

QSGI alleges that it suffered actual damages when its entire inventory of used IBM mainframes, valued at $4,000,000.00, was rendered "effectively worthless" and its $10,000,000.00 investment in Qualtech was sold for $3,000,000.00 as a result of the six-month rule. (2d Am. Compl. ¶ 72).  QSGI has neither alleged any delivery of used mainframe computers by IBM pursuant to a contract nor asserted any other allegations that establish actual damages.  QSGI could not have been deceived by IBM in its acquisition of used mainframes, as QSGI acquired used mainframes from other sources in the open market.  (*Id*. ¶ ¶ 30, 34).  Thus, QSGI's alleged damages are not actual damages compensable under the FDUTPA, and therefore this claim is dismissed.

## IV. Conclusion

THE COURT, being fully advised and having considered the pertinent portions of the record, hereby

ORDERS AND ADJUDGES that Defendants' Motion To Dismiss With Prejudice, filed April 16, 2012 **[DE 54]**, is GRANTED WITH PREJUDICE, as explained herein. The Clerk of Court shall CLOSE this case and deny any pending motions as moot.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this 31 day of July, 2012.

    __S/Kenneth L. Ryskamp__
    KENNETH L. RYSKAMP
    UNITED STATES DISTRICT JUDGE